1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9    GERARDO ROMERO,                          1:09-cv-00153-LJO-DLB (HC)

10                        Petitioner,         FINDINGS AND RECOMMENDATION
                                              REGARDING PETITION FOR WRIT OF
11          v.                                HABEAS CORPUS

12                                            [Doc. 1]
     G.L. BARNES, Warden
13
                         Respondent.
14   _____/

15
            Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus
16
     pursuant to 28 U.S.C. § 2254.
17
                                      BACKGROUND OF CASE
18
            Following a jury trial in the California Superior Court for the County of Kern, Petitioner
19
     was convicted of attempted premeditated murder in which he personally discharged a firearm
20
     (Cal. Penal Code[1] §§ 187(a), 189, 664, 12022.53(c); count 1) and assault with a firearm with
21
     personal use of a firearm (§§ 245(a)(2), 12022.5(a)(1); count 2), both were found to have been
22
     committed for the benefit of a criminal street gang (§ 186.22(b)(1)).  In a bifurcated court trial, it
23
     was found true that Petitioner suffered a prior juvenile adjudication within the meaning of
24
     California's Three Strikes law.  (§§ 667(c)-(j), 1170.12).  2 CT 464; 7 RT 1247-1248.
25
             On December 12, 2006, Petitioner was sentenced on count 1 to life in prison with the
26
     possibility of parole, with a minimum parole eligibility date for 30 years (15 years, pursuant to §
27

28   _____
            [1] All further statutory references are to the California Penal Code unless otherwise indicated.

                                                    1

186.22(b)(5), doubled for the strike), plus 20 years for the firearm enhancement. The sentence on count 2 was stayed pursuant to section 654. 7 RT 1257-1258.

On April 29, 2008, the California Court of Appeal, Fifth Appellate District, affirmed the conviction and judgment. (Lodged Doc. No. 6.) The Court of Appeal denied Petitioner's motion for rehearing on May 14, 2008. (Lodged Doc. No. 5.)

Petitioner filed a petition for review in the California Supreme Court, which was denied on August 18, 2008. (Lodged Doc. No. 18.)

Petitioner filed the instant federal petition for writ of habeas corpus on January 26, 2009. Respondent filed an answer to the petition on April 27, 2009. Petitioner filed an untimely traverse on June 22, 2009.[2]

<u>STATEMENT OF FACTS</u>[3]

From 1993 to 1997, Christopher Gabriel "Jug" Contreras was a member of the Wasco 13 gang, which was also known as Varrio Wasco Rifas. The gang participated in criminal activity, particularly assaults, thefts, and narcotics use and sales. Members did not like it when someone came into court and testified about the gang; they called it snitching, and it could get a person killed. Although Contreras was "jumped out" of the gang in 1997, he still knew people who were affiliated with it and socialized with a few of them.

On October 16, 2005, Contreras had an "Octoberfest" party at his house in Wasco. Ruth, Loza, a longtime friend of his, was one of approximately 50 people who attended. It was a somewhat dressy affair; guests had to wear black and/or white. Wasco 13 members, including appellant (who was known to Contreras by the moniker "Sniper"), Fernando Enriquez (who went by the monikers "Whopper" and "Ghost"), Danny Torres ("Rook-E"), and Epifanio Soto ("Popeye") crashed the party; Contreras asked them to leave because they were not dressed correctly and had not been invited. Although Contreras did not have harsh words with appellant and the others, things got out of hand, and at some point, Loza heard a gunshot in the backyard. Shortly after, members of the sheriff's department arrived. At Contreras's request, Deputy Fleeman told those who were not dressed correctly, including appellant and his companions, to leave.

On October 22, 2005, Loza held a belated birthday party at her residence

---

[2] The Court's screening order in this case set the due date for Petitioner's traverse as thirty days from the date Respondent's answer is filed. Respondent filed an answer on April 27, 2009, and Petitioner's traverse was due on or before May 27, 2009-almost a month prior the date the traverse was actually filed. Even affording Petitioner the benefit of the mailbox rule would not render the traverse timely, as it is dated June 16, 2009, several days after the traverse was actually due. However, for the reasons explained *infra*, even if the Court excused the untimeliness and considered Petitioner's traverse, the petition fails on the merits.

[3] The Court finds the Court of Appeal correctly summarized the facts in its April 29, 2008 opinion. Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District.

in Wasco.  The party was inside the garage, the door to which was open.  There was a fire pit or smudge pot on the driveway.  Some people, including Loza, were drinking.

By approximately 2:00 the next morning, the party had been going on for several hours.  About eight to [ten] people were still in the garage/driveway area.  They were sitting in chairs, talking.  Some, including Contreras and Louis Penalber, who had had a minor dispute with appellant at Contreras's party a week before, had been drinking.

Three young Hispanic males walked past on the sidewalk and sort of started at the partygoers.  Although no one said anything to them, the three yelled, "Wasco Sur 13," as they crossed the street, heading away from the house.[4]  When either Albert Serna or Penalber said, "yeah, whatever, just keep on walking, just keep on walking," the three got angry, turned around, and walked back at a fast pace.

Contreras came out of the garage to try to control the situation before it got out of hand.  He held up his hands and told the three - two of whom he recognized as appellant and Whopper - to calm down, that they didn't have a problem there.[5]  As Contreras approached, appellant separated from his cohorts and moved toward him.  Appellant pulled a small handgun from underneath his jacket or sweater, extended his arm, and pointed the gun at Contreras's face.  Appellant then said "fuck you," and shot Contreras from a distance of approximately five feet, grazing his right cheek.  Appellant's two companions ran, but appellant tried to chamber another round as he started toward the garage, where everyone was gathered.  When the gun jammed, he also fled.

The sheriff's department was immediately called and officers arrived quickly.  Deputy Bravo, the first on scene, found Contreras calmly standing, drinking a beer and laughing, although Bravo did not believe he was intoxicated.  Contreras's cheek was still bleeding, but he told Bravo he did not need medical attention.

Bravo then asked Contreras to tell him what happened.  Contreras said nothing had happened and that he would take care of it.  Bravo could hearing people behind Contreras, telling him to say what had happened and who it was.  Somebody pleaded with Contreras to tell Bravo it was Sniper.[6]  Bravo was unable to get much information from Contreras that night; he kept walking away from Bravo as if he did not want to tell Bravo anything.  Finally, about 20 minutes after Bravo arrived, Contreras said that three Hispanic males were walking by, started "dogging" those at the house, and continued walking.  When they reached the intersection, one of them came running back, pulled a black .38 semiautomatic handgun, and shot at him.  Contrears gave a description of the gunman.

Around this time, Deputy Haisey, who had been at the scene and then left, contacted Bravo and said he had two subjects stopped at a particular location.

---

[4]  Witnesses' memories differed as to exactly when the phrase was uttered, although Contreras, Penalber, and Loza all testified to hearing it during the incident.

[5]  Contreras did not know the third person.

[6]  Bravo never attempted to speak to this person.

Bravo took Contreras and Albert Serna in his patrol car to view the individuals. During the ride, Bravo did not ask Contreras again who shot him. Contreras and Serna said the two detained individuals were not involved. Bravo then took them back to Loza's house. He subsequently had to leave to respond to a call for assistance from another officer.[7]

No one from the sheriff's department talked to Penalber or Loza that night. Loza did not come forward as she was scared the assailants had seen her and might return. Bravo tried telephoning Contreras several times the day after the shooting in order to obtain further information, but Contreras did not return his calls.

Three days after the shooting, Rook-E and Whopper came to Contreras's house. Rook-E said they were not there to disrespect, but that Contreras had better not snitch, or he would be dealt with. Angry and afraid, Contreras asked them to leave.

Bravo worked one shift following the shooting, then was off for three days. When he returned, he contacted Contreras's older brother, a member of the sheriff's department, because Contreras still would not return his calls. He also enlisted the help of Deputy Fleeman in assembling a photographic lineup. When he informed Fleeman that someone had mentioned the name "Sniper" on the night of the shooting, Fleeman identified Sniper as appellant, and so appellant's photograph was included in one of the photographic arrays.

On October 27, Bravo reached Contreras by telephone and told him that he wanted Contreras to view the photographs. Although Contreras refused, he informed Bravo that Loza and Penalber had seen who shot him. As a result, Bravo went to Loza's house that same day and showed her both displays. Loza said none of the people depicted in the one lineup were present. In the second lineup, however, she positively identified appellant's photograph. Bravo then went to Penalber's residence and showed him the same two displays. Penalber did not recognize anyone in the first one, but positively identified appellant's photograph in the second one.

On November 9, 2005, appellant placed a telephone call from the Kern County jail to "Larissa."[8] Partway through the call, appellant asked her to call Rook-E, which she did. Appellant asked Rook-E whether he had gotten hold of Jug and told his people not to go or just to say it was a misunderstanding. Rook-E replied that they had talked to Jug the day before, and that Jug had said to tell appellant to take it to trial, that he was not going to show up. Appellant also said there were two other witnesses, a male and a female, who had selected his picture. Rook-E asked appellant to get him a copy of appellant's paperwork so that he could get whoever was on there. Appellant replied that he was going to get the paperwork on Monday, but that he would be in a lineup that day and the man and woman would be there. Appellant said he did not know them and asked Rook-E to get hold of Jug and let him know to tell whoever talked to the police that it was

_____

[7] According to Contreras, he told Bravo that Sniper had shot him, although he did not say who Sniper was, as he did not know his real name. Contreras also said he could not identify the person who shot him. Contreras lied because he was in fear of retaliation for being a snitch. Contreras told Bravo that he did not want anything done and that everything would be all right.

[8] A tape recording of the call was played for the jury.

a misunderstanding. When, after further conversation, Rook-E said that he and Ghost had talked to him the day before, appellant asked them to do it again and let him know to tell the people who talked to the police not to go or to deny everything. Rook-E told appellant not to "trip," and that he would call Ghost and let him know what was happening. He also said they had tried unsuccessfully to get the names of the other witnesses.[9]

On December 5, 2005, appellant placed a telephone call from the Kern County jail to "Palmira."[10] Appellant claimed the police and witnesses were lying, then said, "But just with that vato says no, boom, they will dismiss." Appellant insisted he was not the perpetrator and said the witnesses differed on what the shooter was wearing. Appellant then mentioned someone he and Palmira knew, and how this person apparently shot someone, but the case was dismissed when the witnesses recanted their identifications. Appellant then mentioned Tony, and said he was going to "send the paper" of what the witness said.[11] Appellant said Tony needed to show it to the person so that the person would not change things. Appellant related that the person had come into the courtroom, but the prosecutor made him leave because he did not want to cooperate. After further conversation, appellant asked Palmira to let Tony know everything and tell him to talk to "that vato." When Tony Romero arrived during the telephone call, appellant informed him that he was going to send Romero the paperwork so that the "vato" would tell the same story. When Tony asked if the case was going to be dropped, appellant replied, "Yeah, just as long as that vato tell you guys ... [¶] ... [¶] ... you know."[12]

On December 24, 2005, appellant placed a telephone call from the Kern County jail and spoke to Tony Romero.[13] Romero related that he had talked to the person on Friday. Appellant said he knew "that vato" did not want to be labeled as a snitch, but that there were two people "[i]n front of that problem" who were saying different things and that they saw what happened. Romero said he was going to call the person right then and wish him a merry Christmas. He told appellant that the person was not going to say anything. Appellant complained about what the woman was doing, but said it did not matter as long as the "vato" did not say anything. Romero informed appellant that the man's brother was a law enforcement officer in Shafter. When appellant asked where the man's brother worked, Romero said he thought at the courthouse, and that he was going to investigate everything that day and talk to the witness. Appellant agreed "that's the main

---

[9] Contreras confirmed that he had told Rook-E that he was not going to show up, and to tell appellant to take it to trial. Contreras did so because he did not want any problems with anyone. Contreras also confirmed that Rook-E had asked him for information on the other witnesses, but that Contreras refused to give it to him.

[10] A tape recording of the call was played for the jury.

[11] Tony Romero is appellant's older brother.

[12] Contreras confirmed that he was subpoenaed and so appeared for the preliminary hearing, but told Bravo and the prosecutor that he did not remember who shot him. He said that all he recalled was a blast, and then he woke up. Contreras lied because he feared for his family. He also lied when he said no one had contacted or pressured him.

[13] A tape recording of the call was played for the jury.

shit," compared to the other two witnesses. Romero reiterated that he had talked to him and everything was "all cool," and that he was going to keep in touch with him. Romero assured appellant that "this shit out here" would "get handled."[14]

On or about February 11, 2006, someone fired a shotgun at Penalber's house. Birdshot penetrated the window and blinds in his children's bedroom, where he had been sleeping. Penalber felt scared for his and his family's lives. Contreras learned of this incident the next day. This made Contreras fear what would happen to his own family if he testified. Contreras drew a connection between this shooting and Wasco 13, because some kind of retaliation was usually what happened when someone testified.

On March 12, 2006, Bravo went to Contreras's house to try to find out who actually named Sniper on the day of the shooting and, in light of the intercepted conversations between appellant and his brother, whether Contreras was going to testify. Bravo surreptitiously recorded his conversation with Contreras, who was still uncooperative and said he did not want anything done and should never have said anything. Bravo used a police tactic to try to get Contreras to admit saying it was Sniper, telling Contreras that Contreras had told Bravo it was Sniper. Contreras affirmed he had said it, although Bravo had no independent recollection of Contreras naming Sniper on the night of the shooting. Bravo never put anything in a report about someone saying it was Sniper on the evening of the shooting, because his sergeant would have kicked it back and said to find out who it was. Bravo tried to confirm the information in the days following the shooting, but Contreras would not answer his telephone calls. When Bravo returned from his days off, he consulted Deputy Fleeman concerning Sniper's identity.

Contreras first testified under oath about the shooting in May 2006. Even then, he lied about not remembering the person who shot at him. He was in fear for his family's lives because of what had happened at Penalber's house. It was bothering him, though, and he finally decided to identify the shooter a few days before trial. He felt he might be saving somebody else's life.

Deputy Fleeman testified as an expert on gangs. According to him, Wasco 13, also known as Varrio Wasco Rifas, had more than 40 members. Common symbols of the gang were 13, Sur, and VWR tattoos. In Fleeman's opinion, Wasco 13's primary activities were the commission of vehicle burglaries and narcotics sales, mainly methamphetamine. Fleeman discussed two predicate cases in which active Wasco 13 members committed burglary and narcotic sales, and opined, based on his prior contacts with appellant and training and experience, that appellant was an active gang member at the time of the shooting, as was Whopper. Fleeman further opined that the shooting was done for the purpose of

---

[14] Contreras confirmed that the voice mail response on his cell phone could be heard on the tape recording, indicating Romero twice tried to call him during the conversation with appellant. Contreras also confirmed that Romero came over to his house one night and told him not to snitch or say anything about Sniper. Romero said he was there to apologize for what his brother had done, which was a big misunderstanding. He said appellant wanted to do good now, and asked Contreras not to testify against him so that appellant could be there for his young child and have a second opportunity at life. Romero showed Contreras a picture of appellant's little boy, as well as the statement Contreras gave to Bravo on the night of the shooting, and told him just to stick with the same story, i.e., that Contreras did not remember anything and did not want anything to happen. Because he did not want any problems with Romero or any of the others, Contreras agreed that he would not say anything in court and did not remember anything

furthering criminal conduct by Wasco 13 members and the gang. According to Fleeman, respect is very important to Hispanic turf gang members, and is the ultimate goal for a gang member. Gang members gain respect through violence, typically assaults. Fleeman opined that the comment from someone at the house to keep on going made the three perpetrators feel disrespected. The shooting let everyone in the area know not to disrespect Wasco 13 gang members. This furthered the gang by placing the community in fear of it. Additionally, the shooter's status was elevated within the gang because he actually committed a crime and shot someone.

(Lodged Doc. No. 6, Opinion at 2-9, 2008 WL 1874521.) (Footnotes in original.)

## DISCUSSION

A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.    Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams (Terry) v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id., quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) (per curiam). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991). However, where the state court decided an issue on the merits but provided no reasoned decision, courts conduct "an independent review of the record . . . to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

C.    Inadmissible Evidence/Instructional Error

Petitioner contends that the trial court erred by admitting evidence of an attempt made by his mother to dissuade Ruth Loza from testifying and identifying Petitioner as the shooter at his preliminary hearing.  Petitioner further contends this error was compounded by the trial court's instruction that such evidence could be considered as showing Petitioner's consciousness of guilt because there was no evidence Petitioner authorized his mother's actions.

1.    *State Court Review*

The California Court of Appeal summarized the relevant portion of the trial proceedings in which this Court concurs:

> At trial, the prosecutor elicited from [eyewitness Ruth] Loza that she had testified at appellant's preliminary hearing on Monday, November 28, 2005.  Two or three days before, two women came to her door.  One asked her, in Spanish, if her name was Ruth.  When Loza said yes, the woman said she heard something had happened and asked what it was.  Loza responded that some kids had shot someone, whereupon the woman asked if Loza had seen the person.  Loza said she had.  When Loza started to say what the woman had told her, defense counsel objected on hearsay grounds and also under Evidence Code section 352.[15]  When the trial court sustained the hearsay objection, the prosecutor countered that the statement was not being offered for the truth of the matter, but instead for the witnesses's state of mind.  The court stated it would permit the testimony as long as Loza could say what the woman asked her to do.  Loza responded that the woman asked her not to testify, and to say that it was not her son.  Loza further testified that, when the woman asked her not to say anything, Loza stayed quiet, but kind of felt bad because the woman was pleading not to say anything.  The woman, who said her name was Maria and that she was the mother of Gerardo, "said they won't do anything.  I'll take him to Mexico.  His brother will come down and get him and take him."
>
> When defense counsel renewed his hearsay objection and moved to strike, the prosecutor again argued that the evidence was not offered for the truth of the matter, but to show Loza's state of mind.  He also noted there would be further foundation and evidence that the jury would hear later, and with which the court was familiar.[16]  Outside the jury's presence, defense counsel again argued the

---

[15] Evidence Code section 352 provides: "The court in its discretion  may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[16] The trial court had already ruled on admissibility of the various tape-recorded telephone calls made by appellant from jail, and had found the bulk of them relevant and admissible under Evidence Code section 352.  One of them was a conversation between appellant and his mother, in which she apparently assured him that everything was going to be all right.  This conversation, which the prosecutor initially argued would corroborate Loza's testimony, ultimately was not presented to the jury.  In appellant's December 5, 2005, call from the jail to Palmira, which was presented to the jury, however, Palmira asked whether the female witness had identified appellant.  Appellant responded affirmatively, then asked Palmira not to let his mother go over there.

statement was highly prejudicial under Evidence Code section 352. The prosecutor countered that, under CALJIC No. 2.20, jurors were allowed to consider, in determining the believability of a witness, anything that had a tendency reasonably to prove or disprove the truthfulness of the witness's testimony, and that whether a witness had been pressured was relevant. When the court asked whether the jury should be admonished that the statement was not to be accepted for the truth of its content, but only in regard to the credibility of the witness, the prosecutor agreed, stating, "That's the only purpose it's being offered is to help them evaluate the credibility. [¶] I think [Loza] is sitting here and testifying courageously, under circumstances where she has been pressured not to, and I think that's something that the jury can evaluate when they're . . . looking at her testimony." The prosecutor also called the court's attention to CALJIC No. 2.05, concerning third-party efforts to procure false or fabricated evidence. The court suggested to defense counsel that it would be a good idea to read that instruction to the jury, but defense counsel argued that Loza was not pressured, and instead the request by appellant's mother had absolutely no bearing on her testimony. Defense counsel objected on foundational grounds, claiming it had not yet been established that Loza was, in fact, approached by someone, as the prosecutor needed to present the tape recordings of appellant's mother, and reiterated his argument that the evidence was highly prejudicial. He stated, however, that if the court were to allow the testimony, he would want CALCRIM No. 371 (the corollary to CALJIC No. 2.05) read to the jury.

The trial court ruled that the jury should be admonished pursuant to CALCRIM No. 371, and that, if that was done, the probative value of the evidence would outweigh its prejudicial effect. Immediately after the jury returned, the court instructed:

"The comments by Miss Loza regarding the two ladies that contacted her . . . are not to be received for the truth of the matter, but only as they may relate to the attitude of the witness or credibility of the witness toward this action or toward the giving of testimony. [¶] . . . [¶]. . . If someone other than the defendant tried to create false evidence, provide false testimony, or conceal or destroy evidence, that conduct may show the defendant was aware of his guilt, but only if the defendant was present and knew about that conduct or, if not present, authorized the other person's actions.

It is up to you and you alone to decide the meaning and importance of this evidence. However, evidence of such conduct cannot prove guilty by itself." On cross-examination, defense counsel elicited from Loza that appellant's mother did not seem threatening, and that Loza had felt sorry for her. When defense counsel suggested Loza was not threatened at all, Loza replied, "Not by her, no." Similarly, when counsel asked, "You weren't intimidated by her, were you?" Loza responded, "By her, no."

During his argument to the jury, the prosecutor suggested Loza had no motive to falsely identify appellant or otherwise testify falsely. He stated: "To the contrary. Pressure was applied to her at her home to not do this and she did testify the way she remembered." During the giving of instructions at the conclusion of the evidentiary portion of trial, the court again instructed the jury in the language of CALCRIM No. 371, to wit: "If someone other than the defendant tried to

---

Sometime before appellant's trial, his mother pled guilty to a misdemeanor as a result of her conduct.

provide false testimony, that conduct may show the defendant was aware of his guilt, but only if the defendant was present and knew about that conduct or, if not present, authorized the other person's actions.  It is up to you to decide the meaning and importance of this evidence; however, evidence of such conduct cannot prove guilt by itself."

(Lodged Doc. No. 6, at 10-13.)

The Court of Appeal went on to find that the claim lacked merit stating:

Here, although Loza testified she did not feel threatened or intimidated by appellant's mother herself, the clear import of her testimony was that she did feel some fear or intimidation.  Pressure was brought to bear on her, by both appellant's mother and the circumstances surrounding the shooting.  While Loza never wavered in her identification of appellant as the shooter, there were some discrepancies between her testimony at the preliminary hearing, before the grand jury, and at trial, and she did not come forward on the night of the shooting, but only identified appellant after Contreras informed Bravo that Loza had seen the shooter.  Thus, the challenged testimony was relevant to Loza's credibility.  [Citations.] Inasmuch as the jury was promptly and correctly instructed concerning the limited purpose of the evidence, and given the essentially polite tenor of the interaction between Loza and appellant's mother, we cannot say the trial court abused its discretion under Evidence Code section 352 by permitting the testimony. [Citation.] Inasmuch as the jury was promptly and correctly instructed concerning the limited purpose of the evidence, and given the essentially polite tenor of the interaction between Loza and appellant's mother, we cannot say the trial court abused its discretion under Evidence Code section 352 by permitting the testimony. [Citation.]

(Id. at 13.)

With regard to the alleged error in giving CALCRIM No. 371 (or the admission of the evidence itself), the Court of Appeal found any error harmless, in light of the fact that the instruction told the jurors such evidence could not be considered to show consciousness of guilt absent evidence of Petitioner's authorization, and, in any event, the instruction benefitted Petitioner by disallowing the jurors to use the shooting of Penalber's house against him. Moreover, there was other independent evidence demonstrating Petitioner's involvement in, and authorization of, attempts to prevent Contreras from testifying and/or identifying him as the shooter, and the evidence regarding Petitioner's mother was insignificant, at best.  (Id. at 13-15.)

2.    *Applicable Law*

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  Id. at 72.  Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id.  The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  See United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v, Kibbe,  431 U.S. 145, 154 (1977)).  Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.).  See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).

Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding. Estelle, 112 S.Ct. at 477; Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), cert. denied, 478 U.S. 1021 (1985).  Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 112 S.Ct. at 482; Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871, 874 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), cert. denied, 510 U.S. 1191, 114 S.Ct. 1294 (1994); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990).  However, the failure to comply with state rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation.  Id. at 920.  Intent is a permissible inference that the jury may draw from the evidence of prior bad acts.  See Houston v. Roe, 177 F.3d 901, 910 n. 6 (9th Cir. 1999).

3.    *Analysis of Claim*

This Court cannot review whether the state courts' ruling of the admission of third-party attempts to suppress evidence was proper under California law.  The only question before this

1    Court is whether the trial court's admission of the evidence rendered the trial so fundamentally

2    unfair as to violate Petitioner's right to due process under the law.  See 28 U.S.C. § 2254(a); see

3    also Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir. 2008) ("review of evidentiary rulings is

4    confined to 'determining whether the admission of evidence rendered the trial so fundamentally

5    unfair as to violate due process.'" (quoting Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir.

6    1998).

7          As fully explained by the state appellate court, the fact that Petitioner's mother went to

8    Loza's residence and asked her not to testify was relevant to Loza's credibility.  In addition, the

9    evidence could not have prejudiced Petitioner because the evidence was admitted to show any

10   affect upon Loza's state of mind and credibility.   Thus, it simply cannot be said such evidence

11   was unduly prejudice to the level of a due process violation.  Accordingly, the state courts'

12   determination of this issue was not contrary to, or an unreasonable application of, clearly

13   established Supreme Court precedent.

14         The instructional error claim is also without merit.  The trial court instructed the jury that

15   the testimony regarding Petitioner's mother was admitted for the sole purpose of the affect it may

16   have had on Ruth Loza's testimony.  The jury was instructed that it could only support a

17   consciousness of guilt if Petitioner was present and knew about that conduct or, if not present,

18   authorized his mother's actions.  Thus, the determination of whether Petitioner consciously

19   attempted to obtain false testimony was rightfully placed within the jury's province.

20   Furthermore, the instruction properly admonished the jury that evidence of consciousness of

21   guilt, by itself, did not establish Petitioner's guilt.  (CT 329; RT 1168-1169.)  Therefore, the

22   Court does not find that the state court's decision was contrary to or an unreasonable application

23   of clearly established federal law.

24   D.    Evidence of Adoptive Admission by Petitioner/Instructional Error

25         Petitioner contends the trial court violated his Fifth Amendment right against self-

26   incrimination by giving prejudicial instructions on an adoptive admission, which authorized

27   adverse inferences to be drawn from Petitioner's silence.

28          The California Court of Appeal denied the claim in a reasoned decision.  The adoptive

admission was derived from a jailhouse conversation between Petitioner and his brother.  The

prosecutor sought to admit the jailhouse telephone conversation as an admission, among other

things.  Defense counsel objected on the ground the evidence was irrelevant and highly

inflammatory.  The trial court agreed with the prosecutor and found a majority of the statements

relevant and admissible under California Evidence Code section 352.  Exhibit 1, at 15-16.

The jailhouse conversation took place on December 24, 2005 between Petitioner and his

brother Tony Romero regarding an individual referred to as "the vato" (inferentially, [victim]

Contreras), which was transcribed as follows:

> [Romero]: . . . you know he's got a kid.  I showed him a picture of your, of your son.
> [Petitioner]: Yeah.
> [Romero]: I man look, look at the cute boy.  (inaudible) you know if you got feelings you know how you got babies you know this and that you gotta (inaudible) he wants to see his son grow.  He wants to see his son grow, you know.
> [Petitioner]: Yeah.
> [Romero]: He's barely and my brother's young too, you know, he made a fucking stupid mistake which anybody can make you know.  You were out there in the streets too (inaudible) fucking work whatever, if you were whatever, you know.
> [Petitioner]: Yeah.
> [Romero]: But everybody makes mistakes you know fucking excuse this and that you know fucking what can I tell you shit.  He's all no this and that you know fucking whatever.  But it's cool and shit.
> [Petitioner]: (inaudible) dawg.
> [Romero]: (inaudible)
> [Petitioner]: All right then, all right then brother.

(Lodged Doc. No. 6, at 15-16; CT 260-261.)

There was no mention of CALCRIM no. 357 (Adoptive Admissions) made during the

initial instructional conferences.  The trial court did indicate that it would give CALCRIM No.

358 (Evidence of Defendant's Statements).  During closing argument to the jury, the prosecutor

discussed the importance of the various recorded telephone calls.  Prior to mentioning the

December 24th conversation, the prosecutor informed the court that there was, potentially, one

more jury instruction that needed to be discussed. The trial court stated that it would be taken up

at the end of the day's session, and the prosecutor proceeded to discuss the substance of the

telephone call, arguing "If Gerardo Romero [Petitioner] were innocent, he'd say what are you

talking about I made a big mistake?  This isn't me.  But that's not how that conversation goes.

He's basically listening and he's taking it in and he's basically agreeing with Tony." (Id. at 16.)

At the end of the court's session that day, the court took up the issue of whether Petitioner's failure to deny his brother's statement that he made a big mistake, constituted an adoptive admission. The prosecutor requested the court give CALCRIM No. 357; however, defense counsel objected arguing that there was no adoptive or tacit admission because Petitioner never admitted anything during the conversations, and the reference to the big mistake could have been the mistake of going out that night instead of staying home. (Id. at 16-17.) The trial court agreed that there was sufficient evidence to submit the issue to the jury for its determination of whether Petitioner admitted the statement was true by virtue of his silence.[17]

The California Court of Appeal found the trial court did not err by submitting the evidence to the jury and instructing the jury on adoptive admissions. The Court of Appeal found the claim to be without merit stating:

> In any event, we find no derogation of [Petitioner's] constitutional rights. "[T]he Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (*Griffin v. California* (1965) 380 U.S. 609, 615, (fn. omitted.) "The rationale of Griffin implicitly proscribes drawing an inference adverse to the defendant from his failure to reply to an accusatory statement if the defendant was asserting his constitutional privilege against self-incrimination." (*People v. Cockrell* (1976) 63 Cal.3d 659, 669-670.)
>
> Thus, "[w]here a defendant's failure to reply is based on his constitutional right to remain silent, instructing the jury that it can treat the failure to reply as an adoptive admission violates the Fifth Amendment. [Citations.]" (*Arnold v. Runnels* (9th Cir. 2005) 421 F.3d 859, 869.)
>
> . . . Here, the circumstances simply do not lend themselves to any

---

[17] To this end, the jury was instructed with CALCRIM No. 357, as follows:

If you conclude that someone made a statement outside of court that accused the defendant of a crime or tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true:

One, the statement was made to the defendant or made in his presence; Two, the defendant heard and understood the statement; Three, the defendant would, under all the circumstances, naturally have denied the statement if he thought it was not true; and, fourth, the defendant could have denied it, but did not.

If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true. If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose.

(Lodged Doc. No. 6, at 17-18; CT 326; RT 1166-1167.)

1   inference [Petitioner] was relying on his right to remain silent. We assume
2   [Petitioner] was relying on his right to remain silent. We assume [Petitioner] was
    advised of his constitutional rights upon his arrest, and we assume, as defense
3   counsel represented to the trial court during a discussion about the tape
    recordings, [Petitioner] was warned that his telephone calls would be monitored
4   or recorded or both. As defense counsel recognized, however, "people have a
    tendency to continue speaking, and in this case that happens to be the situation . .
5   ." [Petitioner] revealed he was more than willing not only to discuss his case, but
    to openly direct others to pressure the witnesses against him. In light of all the
6   circumstances, we see no constitutional impediment to allowing the jurors to
    decide whether [Petitioner] reasonably could have been expected to respond to,
7   and deny, his brother's statement about making a mistake, and, if so, permitting
    them to conclude [Petitioner] thereby admitted the statement was true.

8   (Lodged Doc. No. 6, at 21-22.)

9       A challenge to a jury instruction solely as an error under state law does not state a claim

10  cognizable in a federal habeas corpus action. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

11  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

12  ailing instruction by itself so infected the entire trial that the resulting conviction violates due

13  process. Id. at 72. Additionally, the instruction may not be judged in artificial isolation, but

14  must be considered in the context of the instructions as a whole and the trial record. Id. The

15  court must evaluate jury instructions in the context of the overall charge to the jury as a

16  component of the entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982)

17  (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)). Furthermore, even if it is determined

18  that the instruction violated the petitioner's right to due process, a petitioner can only obtain

19  relief if the unconstitutional instruction had a substantial influence on the conviction and thereby

20  resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710

21  (1993) (whether the error had a substantial and injurious effect or influence in determining the

22  jury's verdict.). See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996). The burden of

23  demonstrating that an erroneous instruction was so prejudicial that it will support a collateral

24  attack on the constitutional validity of a state court's judgment is even greater than the showing

25  required to establish plain error on direct appeal." Id.

26      The Fifth Amendment privilege against self-incrimination is not violated by comments on

27  the defendant's nonassertive conduct prior to the commencement of trial unless the conduct was

28  an assertion of the defendant's Fifth Amendment rights. Doyle v. Ohio, 426 U.S. 610, 619

1   (1976).  In this instance, the state appellate court concluded the instruction was a correct

2   statement of law and properly applied in this case.[18]  Federal courts are bound by state court

3   rulings on questions of state law.  Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), cert.

4   denied, 493 U.S. 942, 110 S.Ct. 344, 107 L.Ed.2d 332 (1989).  There was sufficient evidence for

5   the jury to consider whether Petitioner's failure to deny his brother's statement that he made a big

6   mistake, constituted an adoptive admission.  The giving of the adoptive admission instruction

7   under these circumstances did not violate Petitioner's constitutional rights.

8       Petitioner cannot demonstrate any prejudice resulting therefrom. As discussed below in

9   section E, there was overwhelming evidence that Petitioner went by the nickname "Sniper" and

10  was the individual who fired the shots, independent of Contreras' identification.  As Petitioner

11  has failed to show the challenged instruction had a substantial and injurious effect on the verdict,

12  the state court rejection of this claim was not unreasonable.  In sum, Petitioner has failed to

13  demonstrate that the state court's admission of the conversation with his brother violated any

14  federal constitutional right or denied him a fundamentally fair trial.  Therefore, the appellate

15  court's rejection of this claim was not contrary to, or an unreasonable application of, clearly

16  established Supreme Court precedent.  28 U.S.C. § 2254(d)(1).

17  E.   Prosecutorial Misconduct

18      Claims three and four were presented as one claim (prosecutorial misconduct and

19  ineffective assistance of counsel) in the state court proceedings and will be treated as two parts of

20  the same claim here.  Petitioner contends "the prosecutor's failure to correct Contreras' and

21  Bravo's false and misleading testimony violated the Fourteenth Amendment Due Process

22  Clause."  Petition, Attachment C, at 8.  He further claims that defense counsel's failure to object

23  to the alleged false testimony and failure to obtain important pretrial discovery and carefully

24  investigate the case was ineffective assistance, and he would have taken a plea bargain had he

25

26      [18] Under California law, an adoptive admission of guilt may be presented as evidence when "a person is
    accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear,
27  understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence
    guaranteed by the Fifth Amendment of the United States Constitution, and he fails to speak, or he makes an evasive
28  or equivocal reply. . . .' 'For the adoptive admission exception to apply, . . . a direct accusation in so many words is
    not essential. . . ."  People v. Riel, 22 Cal.4th 1153, 1189 (2000).

1   known the victim identified him as the shooter on the night of the crime.  Petition, Attachment D,

2   at 10.

3       The alleged false testimony arose when Deputy Bravo testified about being informed that

4   the suspect's name was "Sniper."  At trial, Bravo indicated that he was the first officer to arrive

5   at the crime scene and he overheard someone say "tell him it was Sniper . . .", but he was

6   unaware which individual said that.  (RT 719.)  However, on cross-examination, Deputy Bravo

7   stated that Contreras did not initially identify anyone on the night of the shooting. Contreras

8   testified that he told Deputy Bravo on the night of the shooting that Petitioner was "Sniper," and

9   was the shooter.  (RT 695.)  Then, after the lunch break, defense counsel informed the court that

10  the prosecutor informed him there was a CD recording of an interview of Contreras by Deputy

11  Bravo, which had not been provided to him previously.  (RT 691-692.)  The prosecutor indicated

12  that a one-page report documenting the discussion between Contreras and Bravo was provided to

13  the defense.  (RT 703-704.)  The prosecutor clarified that Deputy Bravo informed him that he

14  could not remember who was talking about Sniper on the night of the shooting although he

15  clearly knew it was someone present because a picture of Petitioner was shown to witnesses just

16  a few days later. (RT 720-721, 730.)

17      Defense counsel argued that Deputy Bravo lied and intentionally omitted the fact that

18  "Sniper" was identified as the Petitioner on the night of the shooting from his reports, resulting in

19  a due process violation.  (RT 711-714.)  After reviewing all of the evidence, the trial court

20  concluded there was no bad faith or intentional or unintentional efforts by Deputy Bravo or the

21  prosecutor to conceal information, despite the fact the identification of Petitioner was omitted

22  from the reports.  (RT 732, 736.)

23      The California Court of Appeal rejected this claim in a well-reasoned decision stating, in

24  part:

25      We turn first to the asserted discovery violation. . . .[¶]  Despite the
    foregoing, "evidence that is presented at trial is not considered suppressed,

26      regardless of whether or not it had previously been disclosed during discovery.
    [Citations.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 715.)  This last sentence

27      is dispositive of any claim of ineffective assistance of counsel with respect to what
    occurred at trial, insofar as disclosure of the Contreras-Bravo CD is concerned.

28      No further claim of prosecutorial misconduct or malfeasance, or of a violation of

due process, would have assisted appellant.

Turning to the issue of allegedly uncorrected testimony, "'[u]nder well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents, even if the false evidence was not intentionally submitted.' [Citations.] Put another way, the prosecution has the duty to correct the testimony of its own witnesses that it knows, or should know, is false or misleading. [Citations.] This obligation applies to testimony whose false or misleading character would be evident in light of information known to the police involved in the criminal prosecution [citation], and applies even if the false or misleading testimony goes only to witness credibility [citations]." (*People v. Morrison, supra,* 34 Cal.4th at pp. 716-717; see, e.g., *Giglio v. United States* (1972) 405 U.S. 150, 153-154; *Napue v. Illinois* (1959) 360 U.S. 264, 269.)

As nearly as we can discern, appellant faults defense counsel for not objecting to the prosecutor's failure to correct Contreras's assertedly false and misleading testimony that he told Bravo, just following the shooting, that Sniper was the perpetrator. We are not sure why appellant says this testimony was false or misleading, as the evidence presented at trial was susceptible of the interpretation Contreras mentioned Sniper's name just after the shooting. In any event, Contreras's credibility was in shreds, given the number of times he admitted having lied. One more tatter cannot possibly have made a difference.

Appellant also says defense counsel should have objected to the prosecutor's failure to correct Bravo's testimony that Contreras admitted to him, during the March 2006 conversation that was recorded on the CD, that Contreras mentioned Sniper just after the shooting. Appellant points out that Bravo testified he stated Contreras told him it was Sniper, to which Contreras replied, "yeah," whereas the transcript of the conversation does not show Contreras saying this.

Again, appellant fails to establish trial prejudice as a demonstrable reality. Whether Contreras mentioned Sniper during the investigation immediately following the shooting or whether Bravo got the name from someone else did not matter: authorities clearly obtained the moniker, put a face and real name to it, and obtained two positive eyewitness identifications within a matter of days. Defense counsel ably attacked the less-than-stellar investigation, and placed before the jury Bravo's failure to include information concerning the perpetrator's identity-significant information, as Bravo himself admitted-in his report for what defense counsel succeeded in implicitly attributing to laziness or incompetence. Moreover, as the transcript of the CD gives the impression Contreras implied, during the conversation, that Sniper was the perpetrator, a challenge to Bravo's recollection of what was actually said would have had little, if any, effect.

Appellant makes a further claim that he was denied the effective assistance of counsel at the pleading and plea bargaining stage of proceedings. He says his attorney failed to obtain, investigate, and advise him concerning the CD, which led appellant to reject a favorable plea bargain.[19]

---

[19] Appellant's argument is not a model of clarity. Given defense counsel's argument in support of dismissal or mistrial, we believe appellant's claim to be that, had he known Contreras identified him, he would have accepted a proffered plea bargain.

"[A] substantial portion of the obligation counsel owes is not directly connected with the trial but involves investigation and advice at pretrial and posttrial stages. [Citation.]" *People v. Pope, supra,* 23 Cal.3d at p. 423.) "The pleading- and plea bargaining-stage of a criminal proceeding is a critical stage in the criminal process at which a defendant is entitled to the effective assistance of counsel guaranteed by the federal and California Constitutions. [Citations.]" (*In re Alvernaz* (1992) 2 Cal.4th 924, 933-934.) Where the ineffective assistance of counsel results in the defendant's decision to plea bargain or to reject a proffered plea bargain and proceed to trial, "the defendant has suffered a constitutional violation giving rise to a claim for relief.... [Citations.]" (*Id.* at p. 934.) The violation is not remedied by the fact the defendant, having turned down a proffered plea bargain, subsequently receives a fair trial. (*Id.* at p. 936.)

In order to establish a claim of ineffective assistance of counsel in the context of rejection of a plea bargain, a defendant must establish the same two prongs-deficient performance and prejudice-as in any other context in which an ineffectiveness claim is made. (*In re Alvernaz, supra,* 2 Cal.4th at pp. 936-937.) With respect to the performance prong, "defense counsel must communicate accurately to a defendant the terms of any offer made by the prosecution, and inform the defendant of the consequences of rejecting it.... [A] defense attorney's simple misjudgment as to the strength of the prosecution's case, the chances of acquittal, or the sentence a defendant is likely to receive upon conviction, among other matters involving the exercise of counsel's judgment, will not, without more, give rise to a claim of ineffective assistance of counsel. [Citations.]" (*Id.* at p. 937.) "To establish prejudice, a defendant must prove there is a reasonable probability that, but for counsel's deficient performance, the defendant would have accepted the proffered plea bargain and that in turn it would have been approved by the trial court." (*Ibid.*)

We need not (and do not) determine whether defense counsel's performance was deficient, as appellant "has failed to sustain his burden on the issue of prejudice. [Citations.]" (*In re Alvernaz, supra,* 2 Cal.4th at p. 945.) The record suggests at least two different offers were made to appellant, and that defense counsel likely would have recommended a plea agreement had he been aware of the Contreras-Bravo CD or that Contreras may have named Sniper during the initial investigation. On the record before us, however, we simply cannot tell whether there is a reasonable probability appellant would have accepted a proffered plea bargain, or, instead, continued to pin his hopes on the ability of his cohorts to intimidate witnesses into silence. Thus, appellant's claim fails. (See *People v. Osband* (1996) 13 Cal.4th 622, 665; compare *People v. Snyder* (1993) 14 Cal.App.4th 1166, 1171, 1177 [factual issues that could not be resolved on record on appeal to be resolved at evidentiary hearing where appellant filed petition for writ of habeas corpus that was consolidated with appeal], abrogated on other grounds in *People v. Brown* (1994) 8 Cal.4th 746, 749-750, 756.) The same is true with respect to appellant's assertedly lost opportunity to move for suppression of evidence. (See *People v. Wharton* (1991) 53 Cal.3d 522, 576.)

(Lodged Doc. No. 6, at 34-37.)  (citations omitted.)

The knowing use of false or perjured testimony against a defendant to obtain a conviction is unconstitutional.  Napue v. Illinois, 360 U.S. 264 (1959).  Petitioner bears the burden of "alleg[ing] facts showing that there was knowing use of the perjured testimony by the

prosecution."  Pavao v. Cardwell, 583 F.2d 1075, 1076-1077 (9th Cir. 1978).  In the context of the presentation of false evidence, Petitioner must prove all of the following: "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material."  United States v. Zuno-Arce, 339 F.3d 886, 889 (citing Napue, 360 U.S. at 269-271.)

The fact that there may be inconsistencies in certain witnesses statements and other conflicts in the evidence do not establish that the prosecution presented false testimony.  See e.g., United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir. 1995) (inconsistencies between testimony at trial and retrial did not amount to presentation of false testimony); see also United States v. Croft, 124 F.3d 1109, 1119 (9th Cir. 1997) ("that a witness may have made an earlier inconsistent statement, or that other witnesses have conflicting recollection of events, does not establish that the testimony offered at trial was false").

The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  With regard to counsel's failure to request discovery and properly investigate the case, even assuming counsel was deficient, there is no resulting prejudice because the CD was disclosed during trial and not suppressed, irrespective of whether or not it had previously been requested or disclosed during discovery.  See United States v. Martinez-Mercado, 888 F.2d 1484, 1488 (5th Cir. 1989); United States v. Slocum, 708 F.2d 587, 600 (11th Cir. 1983) (new trial unwarranted based on newly evidence unless, inter alia, the evidence is discovered after trial and due diligence was exercised to discover the evidence prior to trial.)

With regard to Contreras' testimony, it is not clear that he did not mention Sniper's name on the night of the shooting, as the evidence in the record is arguably susceptible to the interpretation that he indeed did so.  In any event, there is no showing that the prosecutor's failure to object to Contreras' allegedly false and misleading testimony had a prejudicial affect upon the proceedings, and neither the prosecutor nor defense counsel committed constitutional error.  Whether Contreras initially identified "Sniper" (Petitioner) as the shooter on the night of the shooting or whether another individual provided the identification was, in the scheme of the

21

entire case, insignificant because authorities clearly received the information from someone who

was at the party.  This is supported by the fact that police compiled a photograph lineup just four

days after the shooting which included a photograph of Petitioner.  (RT 839-853.)  Both

witnesses Ruth Loza and Louis Penalber identified Petitioner as the "shooter."  (RT 109-116,

314-318, 851, 853.)  Thus, because Contreras' identification of "Sniper" as the suspect was of

minimal value in the context of the entire record, it cannot be said there was any resulting

prejudice, and Petitioner cannot establish a due process or ineffective assistance of counsel

violation under Strickland v. Washington, 466 U.S. 668, 687, 697 (1984).[20]

F.    Cumulative Error

Petitioner contends that the state court erred in finding there were no cumulative errors

and contends "that prejudicial cumulative errors violated his right to the fundamentally fair trial

guaranteed by the Fourteenth Amendment Due Process Clause."  (Petition, Attachment E, at 12.)

The state appellate court briefly stated, "We have rejected most of the claims on which

[Petitioner] predicates this cumulative error argument, and as to the rest we conclude none,

singly or in combination," rendered the trial unfair or otherwise prejudiced him. Exhibit 4, at 37.

The United States Supreme Court has not recognized a claim of cumulative error to grant

relief pursuant to a habeas corpus petition.  See Lorraine v. Coyle, 291 F.3d 416, 447 (6th Cir.

2002) ("Supreme Court has not held that distinct constitutional claims can be cumulated to grant

---

[20] In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688.  The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

habeas relief.")  Although the Ninth Circuit recognizes such a claim,[21] in the instant case, because there was no reversible error, Petitioner is not entitled to habeas corpus relief on his claim of cumulative error.  See United States v. Carreno, 363 F.3d 883, 889 n.2 (9th Cir. 2004) (noting that the cumulative error doctrine does not apply where there was no error); Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (holding where there are no errors, there can be no cumulative error).  Consequently, Petitioner's claim fails.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus be DENIED; and

2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    __July 7, 2009__          _____/s/ **Dennis L. Beck**_____
                                    UNITED STATES MAGISTRATE JUDGE

---

[21] Whelchel v. Washington, 232 F.3d 1197, 1212 (9th Cir. 2000) (recognizing cumulative error standard but relief granted based upon single error); see also Daniels v. Woodford, 428 F.3d 1181, 1214 (9th Cir. 2005) (granting relief based on cumulative error); Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002) (rejecting cumulative error claim as meritless); Thomas v. Hubbard, 273 F.3d 1164, 1180 (9th Cir. 2001) (granting relief based on cumulative error), overruled on other grounds, Payton v. Woodford, 229 F.3d 815, 828 n.11 (9th Cir. 2002).